UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT HOOVER,

                Plaintiff,                          Case No. 05-70515

vs.

                                              HONORABLE DENISE PAGE HOOD

JO ANNE B. BARNHART,                 HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION

### I.    BACKGROUND

      Scott Hoover brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

### A.    Procedural History

      Plaintiff, Scott Hoover, protectively applied for SSI and DIB on March 29, 2002 (R. 51, 237), alleging that he became disabled February 1, 2000 (R. 51), as a result of disintegrating disc, chronic back pain, spasms and abscess (R. 62). After Plaintiff's claim was initially denied at the state agency level (R. 37, 240), he requested a hearing which was held on November 19, 2003, before Administrative Law Judge Henry Perez, Jr. (ALJ) (R. 257-76). Plaintiff was represented by

an attorney at the hearing and vocational expert Lawrence Zatkin (VE) was also present and testified at the administrative hearing (R. 48, 272-76).

ALJ Perez concluded in a decision dated January 27, 2004, that Plaintiff was not under a disability as defined by the Act because he remained capable of performing a significant number of jobs existing in the economy (R. 19-27). Plaintiff filed a request with the Appeals Council for review of the ALJ's decision (R. 13), which included additional medical evidence (R. 9). The Appeals Council denied Plaintiff's request for review (R. 6-8), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981. Plaintiff seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

        **B.**      **Background Facts**

        *1.*      *Plaintiff's Testimony and Statements*

In Plaintiff's application he indicated that he first began experiencing back pain in 1987 when he injured his back at his job with Weigand's Disposal (R. 68). Since that time he had been experiencing chronic back pain. His back problem was exacerbated in 1996 when he re-injured it while working for B-Dry. He also developed an abscess in 1995 for which he had surgery, but which never fully healed.

In his *Pain Questionnaire* Plaintiff indicated that he injured his back in 1996 when he was carrying a bucket filled with rock and sand and it broke, jarring his back and disabling him from work (R. 78). He still attempted to work but could only do so on a temporary basis due to his condition, he worked for the last time in February 2000.

He has pain in his lumbar spine, neck and in his colon (due to the abscess). The pain radiates to his hips, knee, feet and hands. Pain is constantly present. Bending and twisting actions increase

the pain, and nothing alleviates it.  He has been prescribed motrin and aspirin, which help for a few hours (R. 79).  He experiences loss of concentration and fatigue from the medication.  He also uses ice to alleviate his back pain.

Though Plaintiff acknowledged that his doctor had not limited his activities in any way, Plaintiff stated that he could walk only 100 feet without stopping due to pain.  He could stand 5-10 minutes, lift 10 pounds and sit for only short periods of time.  He described limitations in his hands and arms saying that his arms felt heavy and his hands went numb.  He could cook small meals and bathe, but had been "confined to the house for two years".

His *Daily Activities* form recorded that Plaintiff rose about 9:00 or 10:00 a.m. and went to bed around 9:00 p.m. (R. 87).  Plaintiff indicated that he had trouble sleeping because he went into convulsions if he rolled over or turned onto his side.  His live-in girlfriend did his laundry and grocery shopping and did most of the cooking, though Plaintiff could prepare frozen meals.  Plaintiff cleaned his dishes and made his bed each day without assistance (R. 88).  Plaintiff could read for 30 minutes at a time and spent 12 hours each day watching television (R. 89).  He visited with family only when they came to him (R. 89-90).  He felt depressed about his condition (R. 90).

At his November 2003 hearing Plaintiff testified that he was 38 years old, had finished 12th grade, but no college or vocational training and had no present source of income (R. 260).  He weighed 320 pounds (R. 270).

In his past work in construction, sanitation and factory work he stood for eight hours a day and lifted 25- 40 pounds (R. 260-61).  He last worked in February 2000 when he was injured (R. 261-62).[1]  He had chronic lower back, head and neck pain,  "shakiness" in his arms from his

---

[1]He applied for worker's compensation and settled out-of-court for $2,500 (R. 262).

3

shoulder to his hands, with radiculopathy and carpal tunnel syndrome (R. 262-63). The lower back pain was constant and radiated to his hip, knee and into his heel (R. 263). Plaintiff took Indocin and Flexeril on a daily basis, and while these medications entirely relieved his symptoms of numbness and pain, they also made him tired (R. 263-64). He also wore a back brace (R. 267). He experienced neck pain with activity, and the pain radiated into his shoulders and caused his arms and hands to go numb (R. 264). This pain caused him to lose function and strength in his hands and also caused headaches and migraines. The prescribed medication did relieve these symptoms as well.

Plaintiff could stand 15 minutes before experiencing pain and numbness in his heel and foot (R. 265). He spent most of the day in an 3/4ths inclined position to relieve his pain (R. 265-67). Plaintiff alleged that he could sit for 30 minutes and walk 100 feet (R. 265-66). Plaintiff stated that he could lift and carry only a half-gallon of milk, but admitted that he had not tried to lift more than that (R. 266, 271). He had trouble sleeping, waking every 2-3 hours with pain and needing medication which left him fatigued during the day (R. 266-67). He was only able to help around the house by letting the dog out, doing dishes and making the bed (R. 267).

When asked whether he could perform an inspection job with a sit/stand option which required lifting parts no heavier than a ball point pen, Plaintiff indicated that he could not (R. 268). Plaintiff felt that his sitting and standing limitations were too great, his hand tremors would preclude him from inspecting small parts and his medication would prevent his using any transportation to get himself to a job. He also did not think he would be able to take a position watching a security monitor, because he had trouble concentrating (R. 269).

### 2.    *Plaintiff's Girlfriend's Testimony*

4

Plaintiff's girlfriend, Stephanie Kontos, completed the *Daily Activities Form* describing her observations of Plaintiff, with whom she lives and has known 10 years (R. 81-86).

Ms. Kontos indicated that she was Plaintiff's only friend (R. 82). He did not have more friends because of his illness, and had not been socially active in 2 years. Plaintiff did have relationships with his parents, brothers and daughter.

He did not go out of the house (R. 81). He painted and raised tropical fish, though she stated that she helped him with the fish. Plaintiff drives once a week, cooks small meals, cleans his dishes and makes his bed, though she indicated that he had trouble sitting, standing and bending with these activities (R. 83). Plaintiff reads once a month for 30 minutes, watches children twice a month and grooms and bathes himself. He needs assistance shopping, cooking and cleaning (R. 85). He gets angry and frustrated with his lack of ability. He has gained 50 pounds in 6 years due to lack of activity (R. 86). Plaintiff spends 12 hours each day watching television and 10-12 hours sleeping (R. 84).

### 2.    *Medical Evidence*

Plaintiff was admitted to the hospital on May 31, 1995, with perirectal and perineal abscess with secondary cellulitis after an out-patient procedure and antibiotics failed to relieve his symptoms (R. 110). He was discharged on June 2, 1995, after undergoing surgery to incise and drain the abscess (R. 109, 118). He was allowed to return to work without restrictions on June 12, 1995 (R. 180,183). Plaintiff was also disabled from work from July 19-24, 1995, apparently due to an increase in drainage at the surgical site (R. 181, 183).

On December 27, 1996, Ronald L. Meisel, D.O., saw Plaintiff for his back pain (R. 133). He prescribed an exercise program and pain medication with a return visit in two weeks to determine

if a CT was needed.  On January 3, 1996, Plaintiff returned reported that his low back pain with radiation to right lower extremity to the knee had returned.  Upon examination Dr. Meisel found straight leg raising to be positive on both sides and the L5-S1 region was mildly tender.  He ordered a CT myelogram to look for degenrative disc disease and rule out a herniated nucleus pulposus.

On January 6, 1997, Plaintiff underwent a lumbar myelogram and CT scan (R. 127-28).  Eli Shapiro, D.O., the interpreting radiologist, noted some changes consistent with degenerative disc disease in L4-5, but found "no obvious abnormalities" and determined that the imaging studies were not conclusive (R. 128).

On January 27, 1997, Plaintiff was examined by S. Maitra, M.D., a consultative examiner (R. 134-36).  Plaintiff reported that he had injured his back at work in September and November 1996, and had not worked since November 1996 due to resulting lower back and right leg pain (R. 134).  Plaintiff indicated he was unable to lift or bend.  Upon physical examination Dr. Maitra found Plaintiff overweight with good posture and able to tip-toe (R. 135).  His range of motion was within normal limits and he had no upper limb neurological deficiency or loss of grip strength.  He had normal lumbar lordosis, no spasm of the paravertebral muscles and good tone.  The lower extremities were also negative for neuroligcal deficiency, but straight leg rasing was positive on the right (60 degrees on right, 75 degrees on left).  Dr. Maitra concluded that Plaintiff suffered from lower back pain with possible right-sided radiculopathy (R. 136).  An x-ray taken the same day revealed moderate disc narowing at L4-5, mild posterior disc narrowing at L3-4 and suspected mild retrolisthesis[2] at L5-S1 (R. 137).  A small ossific structure was found projecting adjacent to the right superior aspect of the L5 verteral body, but it could not be determined if this was a slightly

[2] The posterior displacement of one vertebra on the one below it.

6

displaced fracture fragment or a unusual ununited ossification center. Minute calcific opacity in his right lower pelvis was found to be consistent with phlebolith[3].

On August 5, 2001, Plaintiff sought treatment for difficulty urinating (R. 139). An August 4, 2001, IVP test had revealed a slight calcified projection in Plaintiff's left pelvis, but kidney, pelvis, and ureter studies were normal (R. 145). The impression was an obstruction to the collecting system on the left side at the ureterovesical junction where the small calcification was found. An August 5, 2001, IVP image showed no evidence of a urinary tract obstruction, but did confirm degenerative joint disease in Plaintiff's lower back at L4-5 and L5-S1 (R. 146). An August 6, 2001, abdominal and pelvic CT revealed localized dilatation of the left ureter possibly due to passing of a stone or localized thickening and inflammation (R. 147).

A treatment summary written on May 6, 2002, indicates that Plaintiff visited Robert Diegel, D.C., a chiropractor, for complaints of lower back and leg pain radiating into the right hip and leg on April 15, 2002 (R. 165). At that visit Plaintiff stated that walking, sitting ,bending, twisting and lifting aggravated the pain. Physical examination revealed that Plaintiff had limited range of motion in his cervical and lumbar spine, stiffness, and pain, with spasms of the paravertebral muscles. Occipital fibers were in spasm and the sacroiliac joint capsules were swollen and tender. Plaintiff had normal reflexes but several orthopedic tests were positive. Dr. Diegel concluded that he was unable to determine the severity of Plaintiff's functional limitation, due to lack of follow-up treatment.

A May 16, 2002, colonoscopy was performed after Plaintiff complainted of rectal bleeding and an anal abscess (R. 187). Raymond Landes, M.D., a colo-rectal specialist, indicated that the

---

[3] A calcified vessel in the pelvis.

abscess was resolved after draining.  Dr. Landes removed a small polyp during the colonoscopy, which also revealed a complex fistula-in-ano (R. 188).  Dr. Landes indicated that Plaintiff had "tolerated the procedure well" and gave him permission to resume a regular diet.

On June 3, 2002, Plaintiff underwent an elective procedure to remove an anal fistula and Dr. Landes noted that Plaintiff tolerated the procedure well and returned to post-operative recovery in a "satisfactory" condition (R. 173-74).

On June 6, 2002, Dr. Diegel completed the State of Michigan *Physical Examination Report*, and opined that, although he had difficulty assessing Plaintiff due to the fact the he only saw him twice and Plaintiff failed to follow any treatment plan, Plaintiff could occasionally lift up to 25 pounds, with frequent lifting of up to 10 pounds (R. 200-201).  Dr. Diegel also opined that Plaintiff could stand for 30 minutes and sit or walk for 15 minutes in an eight-hour day (R. 201).  Dr. Diegel found that Plaintiff could perform repetitive grasping, reaching, pulling, pushing, and fine manipulation, and use of foot/leg controls (R. 201).

Plaintiff was examined on July 23, 2002, by Asit Ray, M.D., a consultative examiner (R. 189).  Plaintiff complained of lower back pain radiating to both feet, back stiffness and "sleepy" feeling in his legs from knees to feet when he laid down.  Dr. Ray observed that Plaintiff was morbidly obese, ambulated normally, though at times with a mild limp (R. 190).  Plaintiff could squat fully and stand up again, but was unable to perform straight leg raising or lower extremity strength testing (R. 190-91).  He found no evidence of atrophy of the intrinsic muscles of the hands and noted grip strength of 25 pounds on the right and 20 pounds on the left (R. 191).  Plaintiff denied being able to feel the pinwheel in arms or legs during the sensory examination.  The lower extremity muscle strength test could not be completed because Plaintiff stated he could not apply

8

pressure due to his being unable to bend his hip or ankle. The heel to shin test could not be completed because Plaintiff denied being able to move his leg. Plaintiff was able to get on and off examination table without assistance. Dr. Ray reviewed the X-rays taken by Plaintiff's chiropractor the previous month, and noted "fairly intact" disc spaces and a mild curve in the spine (R. 191). Plaintiff's cervical spine flexibility was normal, but his lumbar spine was limited (R. 197). Dr. Ray felt that some of the clinical findings were inconsistent: Plaintiff could not elevate his legs for heel-to-shin testing, but he had no neurological deficit which explained such paralysis; there was no hand pathology to explain Plaintiff's poor grip strength (which was described as extremely poor for his size); and Plaintiff drove himself to the examination but then reported needing assistance in using the bathroom. Dr. Ray concluded that Plaintiff most likely had low-grade degenerative arthritis in his lower back, but that it was "unlikely to cause such severe pain in the lower back that he could not function". Dr. Ray found that Plaintiff could sit, stand, bend, stoop, carry, push, pull, button clothes, tie shoes, dress/undress, dial a telephone, open a door, make a fist, pick up a coin and a pencil, write and climb stairs (R. 195).

In August 2002, B.D. Choi, M.D., a state agency medical consultant, reviewed Plaintiff's medical file and opined that he retained the ability to occasionally lift 20 pounds, frequently lift up to 10 pounds, and stand, sit, and walk for about 6 hours in an eight-hour workday (R. 102). Dr. Choi also restricted Plaintiff to occasional climbing, stooping, kneeling, crouching, and crawling (R. 103). Dr. Choi concluded that Plaintiff's activity level was not substantially supported by the medical evidence record and that Plaintiff's allegations were only partially credible (R. 106).

On October 9, 2002, Plaintiff visited the emergency room at William Beaumont Hospital complaining of low back pain (R. 223). Plaintiff reported that he had been experiencing low back

9

pain for 34 days, which was radiating into his right leg.  He was experiencing weakness in his lower extremities and difficulty walking.  Physical examination by one doctor revealed no pain in the thoracic or upper lumbar area, strength was "difficult to evaluate", somewhat diminished sensation, bilateral positive straight leg test with crossover and reflexes measured zero (R. 224).  Physical examination by a second doctor revealed negative straight leg test and no sensory deficit discrimination (R. 225).  An MRI was performed which revealed mild canal stenosis at L2-3 through L4-5, all due to mild to moderate circumferential bulging of the discs, with no focal disc protrusions (R. 226-27).  Plaintiff was released in good condition with prescription pain medication and an appointment for physical therapy (R. 225).

On October 14, 2002, Plaintiff was treated by Robert Ho, M.D., a spine specialist, for his back complaints (R. 221).  Plaintiff complained to Dr. Ho of pain in both legs, the pain being more severe on the right.  He also had pain in the bottom of his right foot to the heel and numbness in his toes, with similar symptoms on the left side.  His neck was painful and stiff radiating into his shoulders.  He had numbness in his fingers at night which was relieved with a change of position or shaking his hands.  Plaintiff stated that he was most comfortable when reclining and that prolonged sitting, standing or walking increased his symptoms.  Upon physical examination Dr. Ho noted decreased sensation in the lower extremities, decreased strength grade in both extensor hallucis longus and dorsiflexors and bilateral positive straight leg raising test (R. 221-22).  Dr. Ho recommended restricted bending, lifting and twisting and suggested that physical therapy should be attempted.  No further diagnostic tests would be necessary if the therapy was successful.  Dr. Ho recommended that an EMG of the extremities be preformed to rule out carpal tunnel syndrome in the upper extremities and to evaluate the lower extremity nerves, and that x-rays be taken to evaluate

the lumbar spine stability.

A November 8, 2002, EMG showed chronic right C8 and S1 radiculopathy, with normal results on the left side and normal nerve conduction (R. 229). X-ray studies at that time confirmed the finding of mild to moderate degenerative disc disease in the lumbar spine, with no destructive bony lesions, no fractures, preserved vertebral body heights, and mild to moderate narrowing of intervertebral disc space (R. 220). Plaintiff was noted to have limited mobility with flexion and extension maneuver.

In December 2002, Plaintiff complained to Dr. Ho of the same symptoms as the previous visit. Dr. Ho recommended restricted bending, lifting, and twisting. He ordered further diagnostic testing, in order to determine a course of treatment (R. 218-19).

On March 14, 2003, Plaintiff complained to Dr. Ho of pain in both legs, the pain being more severe on the right (R. 216). He also had numbness in the bottom of his right foot to the heel and in his toes, with similar symptoms on the left side. His neck was painful and stiff radiating into his shoulders. He had numbness in his fingers at night which was relieved with a change of position or shaking his hands. He was also now experiencing hand tremors. Upon physical examination Dr. Ho found Plaintiff to have decreased sensation in his lower extremities, decreased motor function and positive bilateral straight leg test (R. 216-17). He noted that Plaintiff had not obtained any of the recommended diagnostic tests, and that "Patient has many subjective complaints with little in the way of any objective findings" (R. 217). Dr. Ho also noted that most of Plaintiff's complaints were not dermatomal and that he could not find "any cause for the vague symptoms he has of tremors in the upper extremities".

In April and May 2003, attempts were made to perform lumbar myelogram testing; in

both instances, these attempts were unsuccessful due to bony protrusions (R. 212, 214).  CT scans were also performed, and confirmed mild degenerative disc disease at C5-6 and C6-7 and advanced degenerative disease at L4-5 with posterior spur formation and disc space narrowing and associated osteophytes extending from the spinous process of multiple lower lumbar levels (R. 212, 214).

A June 5, 2003, MRI exam of Plaintiff's cervical and lumbosacral spine revealed a broad-based posterior osteophyte with a moderate size right paramedian disc herniation leading to a deformity upon the right side of the cervical spinal cord and effacement upon the exiting right C6 nerve root sleeve (R. 209).  There was a mild diffuse disc bulge and broad-based posterior osteophyte leading to mild effacement upon the ventral aspect of the thecal sac at C6-C7.  Moderate discogenic and spondylodegenerative changes were observed in L2-3 to L5-S1, and at L4-5 in addition to a diffuse disc bulge there was a moderate size paramedian disc herniation leading to further effacement upon the thecal sac and the right L5 nerve root sleeve within its lateral recess.  Moderate predominantly degenerative neural foraminal narrowing was also noted at L4-5 and L5-S1.

On July 7, 2003, Plaintiff complained to Dr. Ho of the same symptoms as his previous visit.  Upon physical examination Dr. Ho found Plaintiff to have decreased sensation in his lower extremities, decreased motor function and positive bilateral straight leg test (R. 206).  Dr. Ho found that Plaintiff's complaints of lower leg pain and his symptoms on a clinical basis did not correlate with his MRI findings, and that surgery was therefore inadvisable as it would not likely be successful (R. 206).  He recommended a conservative management program for Plaintiff (R. 207).

On September 8, 2003, Dr. Ho examined Plaintiff and noted that his condition was

12

unchanged, though he added a diagnosis of carpal tunnel syndrome, left greater than right (R. 232). Dr. Ho also assessed Plaintiff's physical functional ability and found that Plaintiff could lift up to 20 pounds occasionally and less than 10 pounds frequently (R. 202). He opined that Plaintiff could stand and walk less than 2 hours, and sit for less than about 6 hours in an eight-hour day (R. 202-03). Dr. Ho restricted Plaintiff to limited pushing and pulling with both his hands and feet, and indicated that Plaintiff could never climb, balance, kneel, crouch, or crawl (R. 203).

### 4. Appeals Council Evidence[4]

A February 9, 2004, bone scan suggested Plaintiff has arthritis in his large joints, endplate disease in the lumbar spine but no acute fracture, bony injury or infection (R. 248).

An October 27, 2004, EMG confirmed the previous diagnosis of low level/chronic right C5-6 and L5-S1 radiculopathy (R. 251). The study "may suggest early peripheral neuropathy", as the study was borderline for neuropathy. There were further changes from the previous study in that the extremities were affected, were the previous study showed only the lumbar praspinals as being affected. There was no evidence of carpal tunnel syndrome in either upper extremity, but the testing physician indicated that further testing was needed to rule out ulnar neuropathy on the left side (R. 251-52). The changes were described as "very mild".

On November 5, 2004, V. Tahki Campbell, D.O., opined that Plaintiff could lift and carry less than 10 pounds, walk and stand less than 2 hours in an eight-hour day, sit for less than 6 hours in an eight-hour day, was limited in his ability push and pull with both upper and lower extremities,

---

[4]*Cotton v. Secretary*, 2 F.3d 692 (6th Cir. 1993), holds that evidence submitted to the Appeals Council for the first time cannot be considered under a § 405(g) review on the sufficiency of the evidence, but only as related to whether the evidence is new and material warranting a remand.

and could never climb, balance, kneel, crouch, or crawl (R. 254-55). Dr. Campbell based theses findings on a diagnosis of "disc herniation, lumbar cervical; degenerative joint disease of spine"(R. 255). Dr. Campbell also indicated that Plaintiff had limited abilities to handle, finger, and feel with his fingers and hands (R. 256). The doctor further provided that Plaintiff had unspecified environmental limitations in regards to temperature, dust, hazardous machinery and heights, and fumes, odors, chemicals, and gases.

### 5.    *Vocational Expert Testimony*

VE Zatkin testified that Plaintiff's past work was mostly unskilled and medium in exertion (R. 272). ALJ Perez asked him to determine whether a hypothetical individual with the same age, education and vocational experience as Plaintiff could perform Plaintiff's past work, assuming the individual could lift 20 pounds occasionally and 10 pounds frequently; was restricted to occasional climbing, balancing, stooping, crouching, kneeling, or crawling; and was deemed to be at the semiskilled level (R. 272-73). VE Zatkin testified that Plaintiff's grinding job would fall into this category (R. 273).    ALJ Perez then added further limitations to the hypothetical person: lifting 20 pounds occasionally and *less than* 10 pounds frequently; limitations on pushing and pulling with the upper and lower extremities; a sit/stand option; and *no* climbing, balancing, stooping, crouching, kneeling, or crawling; with an individual at the semiskilled level (R. 273).

VE Zatkin testified that such a person could not perform Plaintiff's past work nor were there any semiskilled jobs available for such a person. The individual could perform unskilled jobs with a sit/stand option and there were in excess of 2,000[5] such jobs in the greater metropolitan area, such

---

[5]It is likely this number was meant to be 2,000 and not 20,000 as indicated in the transcript, as VE Zatkin later testifies in response to the question whether this number doubles

as injection molding; feeding and off bearing; inspection; and packaging positions(R. 273).

VE Zatkin indicated that Plaintiff would be limited to unskilled sedentary work with a sit/stand option if the exertional limitations described by Plaintiff were credible and supported by medical evidence (R. 274). There were 6,000 sort/inspect/assemble positions and 4,500 security monitor, information clerk and cashier II positions available in southeast Michigan that would fit this description. VE Zatkin also stated that all employment would be precluded for the hypothetical individual, if that person had the non-exertional limitation Plaintiff testified to, specifically sitting in an inclined position for most of the day (R. 274).

VE Zatkin was asked to consider whether a person with the limitations set forth by Dr. Hode could perform the unskilled jobs identified earlier (R. 275). VE Zatkin indicated that they could, but for 7 - 7 ½ hours per day.

### 6.    The ALJ's Decision

ALJ Perez found that Plaintiff met the disability insured requirements of the Act through March 31, 2003, and that he had not engaged in substantial gainful activity since his alleged onset of disability (R. 26).

Plaintiff was severely impaired, as defined in the regulations 20 C.F.R. 404.1520(c) and 416.920(b), by discogenic and degenerative disorders of the back and obesity. These impairments did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (the "Listing").

Plaintiff's allegations regarding his limitations were not totally credible. He was a younger individual, who was unable to perform his past work and had no transferrable skills.

---

for the state by indicating that "3,500 for the state would be fine" (R. 274).

Plaintiff had the residual functional capacity (RFC) to perform a limited range of unskilled light work with the following functional limitations: lift and carry 10 pounds frequently and 20 pounds occasionally; limited pushing and pulling in the upper extremities within the above weight limits; sit/stand option and can occasionally perform postural activities.

Using the Medical-Vocational Guidelines as a framework, together with the testimony of the VE, ALJ Perez determined that Plaintiff could perform a significant number of jobs in the economy, referring to the limited number of jobs identified by VE Zatkin, and Plaintiff was, therefore, not disabled (R. 26-27).

## II.   ANALYSIS

### A.   <u>Standard Of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past

16

work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.   Factual Analysis

Plaintiff challenges the Commissioner's (a) finding that he was not fully credible and (b) use of the Medical-Vocational grid.  Though Plaintiff did not request a remand based upon the availability of new evidence, he did present new evidence both to the Appeals Council and to this Court, therefore the issue of whether the new evidence is sufficient justification for a remand is also discussed.

#### 1.   *Credibility Determination*

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's  subjective accounts of symptoms, in determining residual functional capacity (RFC).  Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain.  *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852

---

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

(6th Cir. 1986). Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan*, 801 F.2d at 852. Plaintiff argues that his subjective complaints of pain are supported by the objective medical evidence and ALJ Perez therefore erred in finding him not fully credible (Dkt. # 8, p. 10).

*Jones v. Commissioner,* 336 F.3d 469, 476 (6th Cir. 2003), notes that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. The ALJ must say more than that the testimony on pain is not credible. *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id.* at 1039. "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." *Id.* The ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

In the present case ALJ Perez found that Plaintiff

> has medical conditions that reasonably can be expected to result in
> exertional and non-exertional limitations and pain, but not to the

18

> extent that all work is precluded.  Therefore, Claimant's subjective
> complaints are only partially credible.
> Both Claimant's examining and treating physician have concluded
> that Claimant's objective findings are inconsistent with his clinical
> findings and symptoms.  In fact, Dr. Ho, his treating physician,
> included no limits on manipulation and stated claimant could lift
> carry 10-20 pounds, inconsistent with Claimant's allegation of no
> strength in his upper extremities.
> Furthermore, Claimant has been treated only conservatively and is
> not prescribed significant types or dosages of pain medication.

(R. 23).  This finding is consistent with the medical evidence in the record.

Plaintiff had the burden of providing objective evidence confirming the severity of the his alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain.  *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  *See also, McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, Plaintiff has substantial objective and clinical diagnostic evidence of an underlying discogenic and degenerative disorders of his back, confirming his diagnosis of a severe "underlying medical condition."  As in most cases, there is no objective evidence of the pain itself for the relevant time period.  Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  The inconsistency of his subjective evidence to the medical record is central to this analysis.

As ALJ Perez pointed out, there is no record that Plaintiff ever participated in physical therapy for his back pain as more than one treating physical suggested; more than one examining physician questioned the validity of Plaintiff's subjective complaints in light of the objective findings; and despite Plaintiff's claim that he is totally disabled no physician has suggested anything more than conservative treatment.

Given that the ALJ was present to evaluate the credibility of Plaintiff's in-person testimony, this Court is limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were reasonable and supported by substantial evidence in the record. *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Because there is substantial evidence to support the ALJ's finding that Plaintiff was not fully credible, it is recommended that the finding be upheld.

### 2.      *Medical-Vocational Grid*

Plaintiff takes issue with ALJ Perez's use of the Medical-Vocational grid in determining disability.

> At step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir.2003). In many cases, the Commissioner may carry this burden by applying the medical-vocational grid at 20 C.F.R. Pt. 404, Subpt. P, App. 2, which directs a conclusion of "disabled" or "not disabled" based on the claimant's age and education and on whether the claimant has transferable work skills. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir.2003); *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir.1990). However, if a claimant suffers from a limitation not accounted for by the grid, the Commissioner may use the grid as a framework for her decision, but must rely on other evidence to carry her burden. *Id.* In such a case, the Commissioner may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy. *Heston,* 245 F.3d at 537-38; *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir.1996).

*Wilson v. Commissioner of Social Sec.*,  378 F.3d 541, 548 (6th Cir. 2004).

20

Because Plaintiff alleged non-exertional limitations, ALJ Perez used the grid "only as a framework for further evaluation of his ability to perform basic work-related activities" (R. 25). In addition to information in the grid ALJ Perez took into account testimony from VE Zatkin regarding the fact that there were a substantial number of jobs one with Plaintiff's RFC could perform in concluding that Plaintiff was not disabled (*id.*). Plaintiff's argument regarding ALJ Perez's use of the grid is without merit, because he did exactly what is required when an ALJ is presented with a claimant who alleges both exertional and non-exertional limitations.

Further, the limitations ALJ Perez accounted for in Plaintiff's RFC are those that were supported by the record. And, as stated above, a VE's testimony may only be considered evidence where the hypothetical presented accurately portrays the claimant's impairments. *Varley, supra*, 820 F.2d at 779. The ALJ is bound by the record and the hypothetical must "be an accurate summation of the evidence already presented in the record and can neither add to nor detract from that evidence". *Myers*, *supra*, 514 F.2d at 294. On the present record VE Zatkin's testimony was properly considered and it constitutes substantial evidence that there existed a significant number of jobs available to Plaintiff. ALJ Perez's decision that Plaintiff was not disabled should be upheld.

### 3.      *Sentence 6 Remand*

Plaintiff has not specifically requested a remand for consideration of the new evidence he presented in his appeal. As noted above, the evidence cannot be considered part of the record for purposes of substantial evidence review but can only be analyzed by the Court to determine whether to "remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Social Sec.,* 96 F.3d 146, 148 (6th Cir.1996).

For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Such evidence is "material" only if there is a reasonable possibility that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981).[7] A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam). The burden of showing that a remand is appropriate is on the claimant. *Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir.1986).

The new evidence consists of a February 9, 2004, bone scan suggesting arthritis in Plaintiff's

[7]Defendant cites *Sizemore v. Sec'y Health & Human Servs.*, 865 F.2d 709 (6th Cir. 1988) for the proposition that Plaintiff must show that there is a reasonable *probability* that the Secretary would reach a different result with the new evidence, as opposed to a reasonable *possibility*.

In *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988), the Sixth Circuit discusses the materiality standard of § 405(g) and determines that claimants must "demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" in order to meet the materiality burden. 865 F.2d at 711(citations omitted). Yet, it is clear from reading *Sizemore* that the issue of the definition of "materiality" was not before the Sixth Circuit in that case. It also appears that the Sixth Circuit in *Sizemore* misstates the actual law in this and other circuits. None of the cases that it cites support the proposition that the materiality standard requires that there must be a "reasonable probability" of a different outcome. The case law focusing on this specific issue makes it clear that a lower standard of "reasonable possibility," and not "reasonable probability" applies for considering the materiality standard under 42 U.S.C. § 405(g). *See Chaney, supra*, 659 F.2d 676, 679 ("Thus we hold that a remand to the Secretary is not justified if there is no reasonable possibility that it would have changed the outcome of the Secretary's determination."); *Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir. 1987); *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987); *Booz v. Secretary*, 734 F.2d 1378, 1380-81 (9th Cir. 1984); *Dorsey v. Heckler*, 702 F.2d 597 (5th Cir. 1983).

22

large joints and a likelihood of endplate disease in his lumbar spine (R. 248); an October 27, 2004, EMG indicating "very mild" changes confirming the previous diagnosis of low level/chronic right C5-6 and L5-S1 radiculopathy, maybe suggesting "early peripheral neuropathy" in the lower extremities, and requiring further clinical correlation to rule out ulnar neuropathy in Plaintiff's left elbow, but ruling out carpel tunnel syndrome (R. 251-52); and a November 5, 2004, opinion from Dr. Campbell indicating that Plaintiff could lift and carry less than 10 pounds, walk and stand less than 2 hours in an eight-hour day, sit for less than 6 hours in an eight-hour day, was limited in his ability push and pull with both upper and lower extremities, and could never climb, balance, kneel, crouch, or crawl (R. 254-55). Dr. Campbell also indicated that Plaintiff had limited abilities to handle, finger, and feel with his fingers and hands, and had unspecified environmental limitations in regards to temperature, dust, hazardous machinery and heights, and fumes, odors, chemicals, and gases (R. 256).

Plaintiff's last date of insured status for DIB was March 31, 2003 (R. 26). Therefore, to the extent the new evidence indicates Plaintiff's condition after this date, it is not material evidence to his DIB claim. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir.1992)(stating that in order for evidence to be material, it must pertain to the period adjudicated by the ALJ). Further, in *Willis v. Secretary of Health and Human Services*, 727 F.2d 551 (6th Cir.1984), the Court held that in order to "show good cause," the complainant must give a valid reason for failing to obtain evidence prior to the hearing. *Id.* at 554. Plaintiff has failed to provide any reason why he could not have obtained these tests and reports prior to the entry of ALJ Perez's decision, or notified the ALJ that the opinions were forthcoming and request a continuance. *See also, Cline v. Commissioner of Social Security*, 96 F.3d 146, 149 (6th Cir.1996)(finding that failure

23

to notify an ALJ at or following the hearing regarding the need to consider additional medical evidence prevented a claimant from later asserting good cause to submit new evidence).

Additionally, there is little likelihood that the Secretary would have reached a different disposition of the disability claim if presented with this new evidence. The EMG and bone scan merely confirm the previous diagnoses and/or tentatively suggest the possibility of emerging conditions. Also, Dr. Campbell's opinion is not likely to overcome the substantial evidence in the record. While Dr. Campbell, unlike the other treating physicians, suggest greater restrictions on lifting, standing and walking, his RFC is only slightly below the RFC the ALJ found.[8] Furthermore, because of the imprecision of such estimates, this opinion of Dr. Campbell is not likely to modify the credibility finding that caused ALJ Perez to reject Plaintiff's claimed RFC. For all the stated reasons a remand should not be granted for consideration of this new evidence. If further evidence or testing demonstrates a worsening of Plaintiff's conditions or that any emerging conditions are sufficiently severe to preclude all work, Plaintiff can reapply for SSI even though his DIB insured status has expired.

## III.   RECOMMENDATION

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of

---

[8]ALJ Perez's RFC required Plaintiff to lift 10-20 pounds and provided a sit/stand option (R. 26), while Dr. Campbell recommended lifting less than 10 pounds, standing/walking less than 8 hours per day and sitting less than 6 hours per day (R. 254-55).

any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 18, 2006                              s/Steven D. Pepe
Ann Arbor, Michigan                                  United States Magistrate Judge

Certificate of Service

I hereby certify that copies of the above were served upon the attorneys of record by electronic means or by U.S. Mail on January 18, 2006.

                                                     s/William J. Barkholz
                                                     Courtroom Deputy Clerk

25